# LEONARD R. COATES *vs.* THE LOCUST POINT COMPANY.

*Real Estate Broker's Right to Commissions When Lessee's Option to Purchase is Exercised—Limitations—Contract by Unlicensed Real Estate Broker.*

When a broker is employed by the owner of land to effect a sale, but instead of making a present sale procures a person who takes a lease with an option to buy within a certain time, and the owner of the land agrees that if the option is exercised by the lessee then the broker shall be entitled to commissions on the purchase price, the broker is entitled to recover the stipulated commissions when the sale is made under the option since he is the procuring cause thereof.

In such case the broker's right to the commissions accrues when the option is exercised and not when the lease creating it was made, and consequently the Statute of Limitations begins to run against his claim from the former period and not the latter.

Local Code, Art. 4, sec. 695, provides that real estate brokers in Baltimore City must obtain and pay for a license to carry on business, and sec. 696 imposes a fine for acting as a real estate broker without a license but does not declare invalid a contract made by an unlicensed broker. *Held*, that the object of the statute is to raise revenue and not to make illegal contracts made by a broker acting without a license, and consequently an unlicensed broker may recover compensation for services rendered by him.

When under the agreement between the parties a real estate broker is entitled to commissions in case the lessee of property, who has been procured by him, exercises his option to buy the same, and the option is exercised and a part only of the purchase-money is paid, the broker is entitled to commissions at least on the amount paid.

Appeal from the Baltimore City Court (WRIGHT, J.)

. The cause was·argued before McSHERRY, C. J., BRISCOE, BOYD, SCHMUCKER, JONES and BURKE, JJ.

*R. R. Boarman* and *J. J. Lindsay,* for the appellant.

*Edgar Allan· Poe* and *Joseph R. Gunther* (with whom was *John P. Poe* on the brief), for the appellee.

BOYD, J., delivered the opinion of the Court.

This suit was instituted to recover commissions for the sale of a lot of ground in the city of Baltimore claimed to have been made by the appellant for the appellee. The defendant plead the Statute of .Limitations in addition to the general issue.   The first bill of exceptions presents the ruling of the Baltimore City Court on an offer of certain evidence, and the second contains a prayer granted by the Court, at the conclusion of the plaintiff's evidence, which instructed the jury that the plaintiff had offered no evidence legally sufficient to entitle him to recover upon the pleadings, and the verdict must be for the defendant.   The questions to be determined are:

1. Did the appellant make the sale for which the commissions are claimed?

2. Does the fact that he was not a licensed real estate broker for 1903, when the deed was made, preclude his recovery?

3. Is the Statute of Limitations a bar to his recovery?

4. If it be determined that the appellant will be entitled to commissions, was he so entitled when this suit was brought?

1. There can be no doubt from the testimony that the appellant was employed by Dr. Gallagher, the president of the appellee company, to sell the property and that he was to receive two and one-half per cent commission, if he made the sale.   Mr. Levering, the president of the Piedmont-Mt. Airy Guano Company, to which the property was conveyed, testified that Dr. Coates called his attention to the property, brought him and Dr. Gallagher together, and that it was

through the negotiations begun with Dr. Coates that the arrangement was finally made. That was in the latter part of 1897. On the 16th of December, 1897, an agreement was made between the two companies by which the Locust Point Company leased to the Guano Company the lot of ground claimed to have been sold by the appellant for the period of three years from the 1st day of January, 1898, at an annual rental of fifteen hundred dollars. The Guano Company was authorized to sell the machinery contained in the main building upon the demised premises, and apply the proceeds thereof to repairing the main buildings, the wharf, and the flooring of the machine shop, and to replace the platform of the foundry— the proceeds of sale in excess of the repairs, etc., to be paid to the Locust Point Company, less the costs and expenses incident to the sale. It was further agreed that "at any time during the demise hereby created and not thereafter" the Locust Point Company would, upon the payment of $26,000 and a *pro rata* proportion of the rent accruing under the demise to the date of the payment of the purchase-money, convey the demised premises in fee-simple to the Guano Company by a good and merchantable title, free and clear of all incumbrances. The agreement further provided that the term could, at the option of the Guano Company, be extended for another term of two years "at the same rent and upon the same terms and conditions as those hereinbefore contained"—provided notice was given as therein stated.

The President of the Guano Company testified that it availed itself of the option the day it expired, which was December 31st, 1902. The deed was dated the 1st day of January, 1903, and it recites the consideration to be "the sum of five dollars and divers other good and valuable considerations" and conveys this lot of ground and another. A mortgage was given by the Guano Company to the appellee of the same date as the deed, which recites that the Guano Company held an option to buy the property demised for the sum of thirty-one thousand dollars, and having determined to avail itself of the option had issued three promissory notes of even date,

each for the sum of five thousand dollars, payable on the first days of March, May and July, 1903, and also its note of six-teen thousand dollars payable five years after date, as well as certain interest notes. The mortgagor was authorized to pay off the mortgage debt at any time prior to July 1st, 1903, and after that date at any time of the maturity of any interest note. It conveyed the two lots of ground and contained the usual provisions for foreclosure in case of default. Mr. Lev-ering testified that twenty-six thousand dollars was paid for one and five thousand dollars for the other lot of ground. He spoke of the mortgage for sixteen thousand dollars being given to the Sheppard-Pratt Asylum, but it is not explained in the record what he meant by that. The lot for which the sum of twenty-six thousand dollars was to be paid is the one that the appellant had undertaken to sell for the appellee.

Dr. Gallagher was not willing to spend any money in mak-ing the repairs, and the appellee declined to take the property unless they were made. It was then agreed that the machin-ery spoken of should be sold and the proceeds used. Dr. Coates sold the machinery and, apparently, he also had a rail-road switch built to the property. Mr. Levering said that Dr. Coates was the only person he saw during the negotiations until they were virtually consummated, and then Dr. Galla-gher came to instruct Mr. Dawson to draw the lease—the arrangements were carried out as agreed upon by Dr. Coates who "brought the principals together." Dr. Coates testified that at the time of his employment by Dr. Gallagher it was agreed that he was to have two and one-half per cent com-missions. In his testimony is the following: "Q. At the time of your negotiations with Dr. Gallagher was there anything said by Dr. Gallagher as to what commissions you were to receive for making the sale and the carrying out of this agree-ment? A. I was to receive two and a-half per cent if the op-tion was exercised. Q. You were to receive two and a-half per cent if the option was accepted; is that it? A. That is the idea." There is also evidence that the appellant received $75, commission on the first year's rent, but there is nothing

in the record to show that that was received in lieu of the commissions on the sale, in case the option was exercised. There was therefore evidence tending to show that the appellant did make the sale, for it cannot be doubted that, if the appellant's statement is correct, he could not be deprived of the commissions simply because he did not effect a sale at once—he distinctly testified that he was to receive the commissions if the option was exercised, and the evidence tends to show that the agreement or lease was made as the result of his negotiations with Mr. Levering.

This case presents an altogether different question from one in which a broker would be employed to sell property but simply obtained an option. Of course that of itself would not entitle him to commissions, but in this case the option was exercised, the sale consummated, and, according to the plaintiff, the agreement was that he was to have the commissions if the option was exercised. In *Kimberly* v. *Henderson*, 29 Md. 512, the brokers inserted a provision in the contract by which the proposed purchaser had the option of avoiding the contract of sale on payment of a forfeit, and he did avoid it and did not become the purchaser. This Court held that under those circumstances the brokers could not recover the commissions, but the opinion strongly intimated that a different conclusion might have been reached if the party had ultimately become the purchaser. In *Leupold* v. *Weeks*, 96 Md. 280, the contract of sale was conditioned upon the acceptance of the invention referred to by the Reichs-postamt after one year's trial of four hundred instruments which were to be installed in the city of Berlin. Several extensions to the time were given, with the consent of the parties interested, and the sale was finally consummated. We held that as Leupold first procured the purchaser and arranged the terms of contract that formed the foundation upon which the sale was ultimately made, he must be regarded as the procuring cause of the sale notwithstanding the subsequent modification of the contract, and was entitled to the commissions provided for in the agreement creating his agency.

2. Does the fact that the appellant was not a licensed real estate broker in 1903 prevent his recovering the commissions? We cannot understand how that could be. In the first place he did have such license from October 4th, 1897, until the 1st day of May, 1899. He was therefore a licensed broker on the 16th of December, 1897, when the agreement was executed, and there is nothing to show that he was not during the entire negotiations with the Guano Company. The fact that he was not licensed when the option was exercised and the sale consummated could not prevent his recovering commissions on the sale, which was the result of the work done by him when he was licensed, even if it be conceded that his failure to have a license at the time of his negotiations could have such effect. According to the appellant's testimony he rendered the services for which he seeks compensation when he was a licensed broker, and if that be true there can be no reason why he should not be entitled to receive his compensation when it became due, although he was not then a licensed broker.

But aside from that we think the case of *Banks* v. *Mc-Cosker*, 82 Md. 518, is conclusive of the question. In that case this Court held that the failure of a hawker and peddler to take out the license required by the Code did not affect the contract between the unlicensed peddler and the purchaser of goods from him. That statute furnished more reason for such a contention as that made by the appellee than the one applicable to real estate brokers does. Sec. 24 (formerly 27) of Art. 56, provides that "No hawker or peddler shall buy for sale out of the State, or buy to trade, barter or sell, or offer to trade, barter or sell within the State any goods, wares or merchandise until he shall have first taken out a license for that purpose." The penalty prescribed by that statute for its violation is the imposition of a fine, and this Court said: "When the law declares the *consequence* of its violation, the contract can in no sense be regarded as illegal, unless the law itself either by its manifest intent, or in express terms so declares it. The provisions of the Code referred to neither di-

rectly nor indirectly refer to any consequences save the payment of a fine for a violation of the law, and the failure to pay such fine, so that it can only be regarded as a revenue measure, and does not affect the contract between an unlicensed peddler and the purchaser of goods from him."

The statute now under consideration is to be found in Art. 4 of the Local Code, applicable to Baltimore City. Sec. 695 provides that "Any person, co-partnership or firm applying for the same, and paying the sum of money herein provided, may obtain a license for carrying on the business of real estake broker in the city of Baltimore," etc. Section 696 makes it a misdemeanor and imposes a fine for carrying on such business without first obtaining a license but does not declare invalid a contract made by one who was not licensed or indicate that such should be the result. It would seem then to be clearly "a revenue measure," such as was spoken of in *Banks* v. *McCosker*. We are therefore of opinion that the plaintiff was not precluded from recovering by reason of anything in that local law. The general laws on the subject do not apply to Baltimore City, but they do not materially differ from this local law, in respect to the question under consideration.

3. Nor do we think that the Statute of Limitations is a bar to the plaintiff's action. As we have already seen he was only to get the commissions in case the option was exercised. That was not done until December 31st, 1902, and therefore the appellant's cause of action did not accrue until then. He could not have sued before that time, and as this suit was commenced the 27th of June, 1904, the period fixed by the Statute of Limitations (three years) had not expired.

4. It is impossible to determine from this record just how much of the twenty-six thousand dollars had been received by the appellee when this suit was brought, or whether the circumstances were such as to require the appellant to wait until the purchase-money was paid. The agreement between the two companies apparently contemplated the payment of the twenty-six thousand dollars in cash, and it does not appear whether the appellant consented to have the payment of his

commissions postponed until the money was due under the mortgage, but at least fifteen of the thirty-one thousand dollars was due and, as we understand from Mr. Levering's evidence, was paid before the suit was brought. It may be that the appellee also realized on the mortgage before then, as Mr. Levering spoke of the mortgage to the Sheppard-Pratt Asylum for the sixteen thousand dollars, and possibly the appellee had sold it to that institution. But it is apparent that the appellant is entitled to commissions on the fifteen thousand dollars, or at least so much of it as was to be applied to the payment of the twenty-six thousand dollars, and hence the Court below was in error in granting the prayer, which prevented the appellant from recovering anything. We will not undertake to determine from the meager facts that appear in this record whether he can recover commissions on the sixteen thousand dollars, which under the terms of the mortgage was not due for five years.

Nor do we deem it necessary to discuss the first bill of exceptions. That exception is thus stated in the record : "To the sustaining of the defendant's objections to any sale made by the plaintiff by which he claims commissions unless he was a licensed real estate broker in the year *eighteen hundred and ninety-three*, the plaintiff excepted," etc. We suppose it was intended to be "in the year nineteen hundred and three," but assuming that to be so what we have said above on the subject is sufficient. The judgment will be reversed.

*Judgment reversed and new trial awarded,
the appellees to pay the cost.*

(Decided December 6th, 1905.)