## TOOLE *v.* WIREGRASS DEVELOPMENT COMPANY.

1. Under a statute passed for the purpose of raising revenue, which provides that every person or firm engaged in the business of buying or selling real estate on commission shall pay the sum of ten dollars for each county in which he or they may conduct such business, and that before such persons shall be authorized to open up or carry on such business they shall go before the ordinary of the county in which they propose to do business and register their names and the business they propose to engage in, the place where it is to be conducted, and shall then pay their tax to the collector, and that any person failing to comply with the foregoing requirements shall be guilty of a misdemeanor, but which does not provide that the contracts made by such persons failing to comply with the statute shall be void and unenforceable, it is not a defense to a suit brought by such person selling or buying real estate on commission, to recover commissions on sales of real estate made by him, that he had failed to pay the tax and register as required by the statute.

2. The court erred in sustaining the demurrer to the petition.

.JULY 14, 1914.

Complaint.    Before Judge Thomas.    Colquitt superior court.
April 16, 1913.

The plaintiff, John F. Toole, brought suit against the Wiregrass Development Company to recover the sum of $7,500 as commissions on sales of real estate during the years of 1910 and 1911. The petition alleged, in substance, as follows: In June, 1910, the plaintiff was conducting a real estate business at Macon, Ga. At this time plaintiff and defendant began negotiations looking to the employment of plaintiff by defendant, to handle and sell for defendant a lot of town property at Pecan City in Dougherty county, Georgia. The property was divided into numerous parcels, and it was in the contemplation of the parties that the parcels should be sold separately or together, and that it would probably take several months in order to complete the sale. In August, 1910, pursuant to the negotiations, defendant through its president and general manager, W. E. Aycock, telegraphed plaintiff to come to its office at Moultrie, Ga., to discuss with the defendant the making of the contract. In response to the telegram plaintiff went to defendant's office and came to an agreement with defendant, by the terms of which plaintiff was to move from Macon, Ga., to Pecan City, and was to remain there as a resident salesman and general agent of the defendant company, looking after and preserving the lands, improving, advertising, and selling the same as rapidly as possible.

Under the agreement plaintiff was to receive no salary or compensation for his services, except commissions on the purchase-price of any and all of the lands sold by the company, plaintiff's commissions being 10 per cent. of the purchase-price of all sales made by him alone and independently of the efforts of other real estate agents and of defendant, and 5 per cent. upon any and all other sales of land made by the company while plaintiff continued at the work. In October, 1910, plaintiff removed from Macon to Pecan City and entered upon his duties under the contract. He continued to remain at Pecan City until September, 1911. During the time he was at Pecan City he faithfully discharged his duties under the contract, and vigorously advertised and pushed the sales of the parcel of land, carefully protected it and remained on it for the purpose of showing prospective purchasers over it, and gave his best efforts to the establishment of a post-office, schools, churches, and merchants in the town. During the months of October, November, December, January, and February, considerable portions of the' lands were sold by the company to various persons, amounting to about $12,000; and in each instance, as soon as the sale was closed, the defendant paid the plaintiff, in accordance with its contract, 10 per cent. commissions on such sales as were made by the plaintiff alone, and 5 per cent. on all other sales. In the course of his advertising the lands and by correspondence, the plaintiff, in February, 1911, wrote to J. H. Ernest, of Albany, Ga., who was dealing extensively in lands in that vicinity, seeking to effect a sale of the entire tract of land to him. He did not reply to the letter in writing, but soon thereafter went to see the lands and began to consider the purchase. While continuing his efforts to sell the land, W. E. Aycock, the president of the company notified the plaintiff in April, 1911, that he had hopes of selling the entire remaining portion of the land to Ernest, and suggested to plaintiff that he suspend further advertisement of the lands pending the negotiations with Ernest. Pending these negotiations Aycock consulted with the plaintiff as to the manner of securing the sale to Ernest; and finally, a short time thereafter, Aycock notified plaintiff that the company had succeeded in selling to Ernest all of the property then remaining, except a few town lots. The company did, in June, 1911, sell to Ernest, or to him and his associates, the remaining land, and the price agreed upon was $150,000. After the

sale Aycock told plaintiff that plaintiff's commission of 5 per cent. on the purchase-price should be paid as soon as possible, but that the purchase-price was partly on credit, and plaintiff might have to take his commissions in notes, which plaintiff agreed to do. Later, in November, 1911, plaintiff was notified by Aycock that he would not be paid his commissions on the sale to Ernest, for the alleged reason that the directors of the company declined to authorize payment.

Plaintiff further alleged: He did not, in the year 1911 or 1912, go before the ordinary of Bibb, Dougherty, or Colquitt county and register his name, the business that he proposed to engage in, and the place where it was to be conducted, or pay special tax as a person engaged in the business of buying and selling real estate on commissions. It was not necessary for him to do so, because the contract made by him with defendant was one of employment and service, and not one of the real estate owner on the one hand and a person or firm engaged in the business of buying and selling real estate on commissions on the other, for the reason that plaintiff was not, at the time of making the contract or at any time during the execution thereof, a person or firm engaged in the business of buying or selling real estate on commission; but on the contrary plaintiff was, during all of that time, the employee of defendant alone, and his entire time and services were, by the terms of the contract, commanded by the defendant alone, and he was not employed by or rendering service to any one else. The contract between plaintiff and defendant was not such a one for the selling of real estate on commission as is contemplated by the tax acts imposing a tax on a person or firm engaged in the business of buying or selling real estate on commission. Further, at the time that plaintiff was engaged in the execution of the contract he was an indigent Confederate soldier who was a resident of this State, and therefore was not subject to the payment of the tax, and even if he was subject to the tax, the non-payment of it is not and should not be a legal reason why he should not be entitled to his compensation under the terms of the contract.

The defendant demurred to the petition, on the grounds, among others, that there was nothing alleged to show that Aycock had any authority, expressed or implied, to bind the defendant corporation; and that the plaintiff could not recover a money judgment

against the defendant, the petition showing that there was only an agreement for a sale and that no sale had been finally consummated, and not alleging that the purchase-price, or any portion thereof, had ever been paid to the defendant. A further ground of demurrer was, that, it appearing that the plaintiff had not complied with the law with reference to real estate agents taking a license to do business, there can be no recovery in this case. The court sustained the demurrer on each and every ground, and dismissed the petition. Whereupon the plaintiff excepted.

*W. A. Covington* and *Pope & Bennet,* for plaintiff.

*Shipp & Kline,* for defendant.

HILL, J. (After stating the foregoing facts.)

The plaintiff brought suit against the Wiregrass Development Company to recover certain commissions, amounting to $7,500, alleged to have been earned by the sale of certain real estate under and by virtue of a contract entered into between the plaintiff and the defendant. The defendant demurred to the petition on the various grounds set out in the foregoing statement of facts. One ground of the demurrer was that the plaintiff was not entitled to recover, because he had not complied with the law with reference to real estate agents taking out a license to do business as required by statute, and that the contract was therefore void and unenforceable. The court sustained the demurrer and dismissed the petition. We will now consider this ground of the demurrer.

The Civil Code, § 971, provides: "Upon every person or firm engaged in the business of buying or selling real estate on commission, or as agents renting real estate, the sum of ten dollars for each county in which he or they may conduct said business. And if such person or firm shall engage in auctioneering, or selling property at public outcry, or by auction sales, he or they shall also be liable for and required to pay the tax required of auctioneers by section 923." Section 978 of the Civil Code is as follows: "Before any person shall be authorized to open up or carry on said business [as provided for in that article, which included section 971, supra], they shall go before the ordinary of the county in which they propose to do business, and register their names, the business they propose to engage in, the place where it is to be conducted, and they shall then proceed to pay their tax to the collector. . . Any person failing to register with the ordinary, or, having reg-

istered, fails to pay the special tax as herein required, shall be guilty of a misdemeanor and" be punished accordingly. The defendant relies upon the decision in the case of *Murray* v. *Williams,* 121 *Ga.* 63 (48 S. E. 686), where it was held: "A physician who has failed to register in compliance with the provisions of the Political Code, §§ 1479, 1480, can not recover for professional services rendered by him." The *Murray* case stands upon a very different footing from the case at bar. That case was based upon the law now embodied in the Civil Code of 1910, §§ 1684, 1685, as follows: "§ 1684. Every person lawfully engaged in the practice of medicine in this State, before commencing to practice, shall register in the office of the clerk of the superior court of the county wherein he resides and is practicing, or intends to commence the practice of medicine, in a book to be kept for the purpose by said clerk, his name, residence, and place of birth, together with his authority for practicing medicine, as prescribed in this Chapter. The person so registering shall subscribe or verify, by oath or affirmation, before a person duly qualified to administer oaths under the laws of this State, an affidavit containing such facts, and whether such authority is by diploma or license, and the date of same, and by whom granted, which shall be exhibited to the county clerk before the applicant shall be allowed to register. The county clerk shall receive a fee of fifty cents for each registration, to be paid by the person so registering." "§ 1685. Any such registered physician in this State, who may change his residence from one county into another county in this State, shall register within the clerk's office of the county to which he removes and wherein he intends to reside and to practice medicine, as provided in the preceding section." These sections of the code were not adopted primarily for the purpose of raising revenue, as in the case of the tax required of real estate agents, and others, as we will show later, but for the purpose of regulating the practice of medicine in this State. It was on grounds of public policy and for the protection of the citizens of the State. These last-quoted sections are not in the same division of the code as are the sections relating to real estate agents. In the *Murray* case, supra, Fish, P. J., said: "These sections of the code are intended to protect the public against incompetent and unqualified practitioners of medicine, and not for raising revenue, and are, therefore, prohibitory." The former sections requiring real estate agents, and

other classes of taxpayers, to register and pay a license tax, are revenue measures, and are placed under the title "Public Revenue," whereas the latter are classed under the title "Practice of Medicine, How Regulated." It will be observed from reading the foregoing sections of the code, that, "before commencing to practice," every person lawfully engaged in the practice of medicine within the State shall register in the office of the clerk of the superior court, etc. The clerk shall receive a fee of fifty cents for each registration. This clearly is not a revenue measure, as in the other case. Section 1697, which is codified from the act of 1894 (Acts 1894, p. 89), expressly provides that if any person "shall practice medicine or surgery in this State in violation of the provisions of this Article, . . it shall not be lawful for him to recover compensation for service which may be claimed to have been rendered by him as such physician or surgeon." This section also makes a violation of the provisions of the article a misdemeanor and punishable as such, as did section 1491 of the Political Code of 1895, in force when the decision in the *Murray* case was rendered. The controlling question in the instant case is, was the act of the plaintiff in selling real estate on commission, without having registered and paid his license tax as required by law, void; and is he precluded from recovering on the contract made with the defendant, because of his failure to register and pay the tax as required by the statute?

In the case of Hughes v. Snell, 28 Okla. 828 (115 Pac. 1105, 34 L. R. A. (N. S.) 1133, 25 Ann. Cas. (1912D) 374), the plaintiff brought suit to recover commissions earned on a sale of real estate. The defendants answered that the sale and the business out of which the same grew on the part of the plaintiff were prohibited and made unlawful by valid ordinances of Oklahoma City, in that the plaintiffs had failed to procure a license to permit them to engage in the business of real estate agents or brokers as required by the ordinance, and therefore the contract was void and unenforceable. It was held: "To the general rule that an act in violation of a statute or municipal ordinance forbidding it is void, there is an exception when the statute or ordinance is for the purpose of raising revenue, and does not make the act itself void, and the act is not malum in se nor detrimental to good morals." In the case of Vermont Loan &c. Co. v. Hoffman, 5 Idaho, 376 (49 Pac. 314, 37 L. R. A. 509, 95 Am. St. R. 186), it was said: "The general

rule, as urged by appellants, that a contract founded on an act forbidden by a statute under a penalty is void, although it be not expressly declared to be so, is correct and well established by authority. But in applying the rule many courts have excepted from its operation one class of cases, viz., when the statutory prohibition is found in a statute enacted for the purpose of raising revenue or the regulation of traffic or business, when, unless it is manifestly the intention of the statute to make the contract void, the court will treat the contract as valid." In Sutherland on Stat. Con. § 336, it is said: "When a statute is for revenue purposes, or is a regulation of a traffic or business, and not to prohibit it altogether, whether a contract which violates the statute shall be treated as wholly void will depend on the intention expressed in the particular statute. Unless the contrary intention is manifest, the contract will be valid." In the case of Coates v. Locust Point Co., 102 Md. 291 (62 Atl. 625, 5 Ann. Cas. 895), it was said: "The failure of a hawker and peddler to take out the license required by the code did not affect the contract between the unlicensed peddler and the purchaser of goods from him. That statute furnished more reason for such a contention as that made by the appellee than the one applicable to real estate brokers does. Sec. 24 (formerly 27) of Art. 56 provides that 'no hawker or peddler shall buy for sale out of the State, or buy to trade, barter, or sell, . . within the State, any goods, wares, or merchandise, until he shall have first taken out a license for that purpose.' The penalty prescribed by that statute for its violation is the imposition of a fine, and this court said: 'When the law declares the consequence of its violation, the contract can in no sense be regarded as illegal, unless the law itself, either by its manifest intent or in express terms, so declares it. The provisions of the code referred to neither directly nor indirectly refer to any consequences save the payment of a fine for a violation of the law, and the failure to pay such fine, so that it can only be regarded as a revenue measure, and does not affect the contract between an unlicensed peddler and the purchaser of goods from him.' The statute now under consideration is to be found in Art. 4 of the local code, applicable to Baltimore City. Section 695 provides that 'any person, copartnership, or firm applying for the same, and paying the sum of money herein provided, may obtain a license for carrying on the business of real estate broker in the City of Baltimore,' etc. Sec-

tion 696 makes it a misdemeanor and imposes a fine for carrying on such business without first obtaining a license, but does not declare invalid a contract made by one who was not licensed, or indicate that such should be the result. It would seem, then, to be clearly 'a revenue measure,' such as was spoken of in Banks *v.* McCosker. We are therefore of the opinion that the plaintiff was not precluded from recovering by reason of anything in that local law." In the case of Watkins Land Mtg. Co. *v.* Thetford, 43 Tex. Civ. App. 536 (96 S. W. 72), the plaintiff brought suit to recover commissions for the sale of land. The defense was that the plaintiff had not paid the occupation tax and obtained a license as required, and was therefore precluded from recovering commissions. The court said: "We do not think this contention is sound. In our opinion it was not the purpose or intention of the statute providing for the payment of an occupation tax by a real estate agent or broker to make such payment a prerequisite to his right to pursue the occupation. The civil statutes providing for the tax, and the penal statutes making it a misdemeanor to pursue the occupation without paying the tax, were enacted for the purposes of providing a source of revenue for the State and the enforcement of the collection thereof." In the case of Amato *v.* Dreyfus (Texas), 34 S. W. 450, it is said: "Assuming that appellee was, as to the service alleged, one pursuing the occupation of land agent, within the meaning of the former article, the question is solved by determining whether the prohibition contained in the latter article is directed against the person or the business. It is plain to us that the primary object of the statute is to provide revenue, and that it was not its purpose to repress or prohibit the several occupations it undertakes to license. The provision is that no person shall pursue any occupation unless he has such a receipt, which means that the person is prohibited, not the occupation. No consideration of public policy, nor one looking to the regulation of the business, enters into the statute in question. The purpose sought to be subserved is altogether different. It could with as much propriety be asserted that a merchant carrying on business under the same circumstances would not be allowed to enforce payment for goods sold, nor a banker for money loaned. If the legislature intended that the act should be so far-reaching in its operation, it would certainly have made such intention clear. The view is amply sustained by authority." See also, to the same

effect, Harris *v.* Runnels, 53 U. S. 79 (13 L. ed. 901) ; Niemeyer *v.* Wright, 75 Va. 239 (40 Am. Rep. 720, and cases cited).

As stated in the first part of this opinion, the sections of the code requiring each person or firm engaged in the business of buying or selling real estate on commission are in the division of the Civil Code under the title "Public Revenue." Art. 1 provides an ad valorem tax for the payment of outstanding bonds of the State, and an ad valorem tax to meet appropriations. Then follows the provision that "In addition to the ad valorem tax on real estate and personal property, as required by the constitution and provided for in the preceding sections, the following specific and occupation taxes shall be levied and collected each and every year beginning in 1910." Civil Code, § 916. The tax imposed on real estate dealers follows in this same article. It is nowhere provided that a failure to pay the tax, or to procure the license and register, renders any contract made by the real estate dealer in violation of the act void. The penalty for the violation of the act is against the person of the agent, and not against his act. For a violation of the act he is to be punished as for a misdemeanor, which is merely a means of enforcing the payment of the tax against the defaulter, but the State does not specifically or by necessary implication make contracts of sale between a dealer in real estate violating the statute and third persons void because of a failure to pay the tax. The act nowhere declares that such contracts shall be void; and unless it does so expressly or by necessary implication, under the weight of authority the contracts are valid and enforceable. From what has been said, and the authorities cited, we hold that the plaintiff's petition set forth a good cause of action, and should not have been dismissed on demurrer. The other grounds of demurrer are without substantial merit.　　*Judgment reversed. All the Justices concur.*