HODGES *v.* MONTEZUMA FERTILIZER COMPANY.

GILBERT, J. 1. (*a*) Where a contract for the purchase of fertilizers specifically provides from what source the phosphoric acid, the nitrogen, or the potash is to be derived, and where the fertilizer is furnished in accordance with such special order, such contract of sale would be void unless the fertilizers so furnished had been registered as provided by Civil Code (1910), § 1771.

(*b*) The fact that such fertilizers were furnished as ordered under a name or brand properly registered with the Commissioner of Agriculture, but which registration gives a source other than the actual one from which the phosphoric acid, nitrogen, or potash is derived, would not operate to change the rule above stated.

(*c*) In view of the answers to questions 1 (*a*) and 1 (*b*), this question is answered in the affirmative.

2. After a sample of fertilizer drawn by the official inspector has been filed with the Commissioner of Agriculture and has been analyzed by the State Chemist and certified to the Commissioner of Agriculture and by him recorded and entered as official, the State Commissioner of Agriculture has the right and power to make, through the State Chemist, another or corrected analysis from the same sample, which, upon proper certification, is admissible as evidence in the courts of this State on the trial of any issue involving the merits of said fertilizer.    *All the Justices concur.*

No. 1724. MAY 15, 1920.

The Court of Appeals certified to the following questions (in Cases Nos. 10672, 10673) :

" To a suit by the Montezuma Fertilizer Company for the purchase-price of fertilizers sold, the defendant, B. C. Hodges, inter-

posed a plea setting up two grounds of defense: (1) that brand
' 840,' under which name or number the fertilizer was furnished,
as registered with the State Commissioner of Agriculture, stated
that its nitrogen was derived from 'blood, tankage, cyanimid, and
sulphate of ammonia,' whereas the fertilizer as actually shipped
and sued for derived its nitrogen from 'equal parts of fish-scrap,
blood, and tankage,' and that no fertilizer with its nitrogen derived
from any such source was registered with the Commissioner of
Agriculture, for which reason defendant contends that the sale
of the fertilizer was illegal, and the contract sued on void, inas-
much as the registration laws governing fertilizers had not been
complied with; (2) that in the event the contract should not be
adjudged illegal and void, he was still entitled to a reduction of
twenty-five per cent. of the purchase-price as a penalty, because
of the fact that the official analysis showed that the actual com-
mercial value of such fertilizer fell more than three per cent.
below the guaranty. The case was first tried before a jury, who
returned a verdict in favor of the plaintiff for the amount sued
for. A new trial was granted by the trial judge, who upon the
second trial, sitting as both court and jury, heard and determined
the case upon an agreed statement of facts. It appears from the
agreed statement of facts that the defendant bought of the
plaintiff certain fertilizers under a special formula furnished
by the purchaser, whereby it was stipulated that the nitrogen
was to be derived from 'equal parts of fish-scrap, blood, and
tankage.' The fertilizer with its nitrogen derived from such
sources was shipped out under the registered brand ' 840.' Brand
' 840 ' as registered with the Commissioner of Agriculture is there
stated to derive its nitrogen from 'blood, tankage, cyanimid, and
sulphate of ammonia.' A properly certified copy of the official
analysis of this fertilizer ' 840 ' as made by the State chemist and
furnished to the purchaser showed a deficiency in the phosphoric
acid, which resulted in a diminution of the commercial value of
the fertilizer amounting to more than three per cent. Subse-
quently, upon the request of the seller, the Department of Agri-
culture, through the State Chemist, rechecked the original analysis
from the original samples, and certified the new and corrected
analysis. Under the corrected analysis the deficiency was such that
the diminution in the commercial value amounted to less than

three per cent. The agreed statement of facts shows that the State Chemist swore that he and every member of his staff rechecked the analysis, thereby discovering an error in the original work, and the evidence of the State Chemist is to the effect that the second or corrected analysis is true and correct. Upon the trial the judge held that the contract sued on was not void under the contention first above set forth. He further held the second or corrected analysis to be inadmissible as evidence and without probative value, for the reason that the law (Park's Ann. Code, §§ 1773, 1783) does not provide for any such corrections to be made of an official analysis. He appears not to have considered the evidence of the State Chemist given in support of the second analysis, the judgment of the trial judge being in terms as follows: 'Under an order granted during the March, 1919, term of the city court of Americus, all parties of record consenting, the above-stated cause was assigned to be heard in vacation on April 18th, 1919, and by said consent order it was provided that all questions of law and fact should be passed upon and judgment rendered in said cause by the presiding judge without the intervention of a jury — the right of exception or motion for new trial being reserved to all parties as though said case was heard in term time. Although the cause is submitted on an agreed statement of facts, defendant's counsel urged the objection that the second analysis made by the State Chemist and set out in said agreed statement of facts and denominated by the Agricultural Department as 'corrected analysis' was inadmissible in and could not legally be considered as evidence by the court in determining what analysis and what commercial value the seventy tons of guano developed. It was also urged by defendant's counsel, that, plaintiff having no brand registered from which the nitrogen was to be derived from equal parts of blood and tankage and fish-scrap, the sale was illegal and void, and hence that plaintiff could not recover. As I view the record, the cause turns upon two questions of law: First, did the adding of fish-scrap, which was not covered by the registration, render the sale void? Without elaboration, my conclusion is that it did not. Second, was defendant's objection to 'corrected analysis' good, and can the first analysis be considered? Reading sections 1773 and 1783 in pari materia, I am constrained to the view that the 'corrected analysis' is inadmissible in evidence; the law provides that when the State Chemist

certifies the analysis to the Commissioner of Agriculture, such analysis *shall* be recorded as *official,* etc., and that such analysis, under seal, etc., *shall* be admissible in evidence. The statute as it stands does not seem to contemplate or provide for corrections such as was offered in this cause, and furnishes no authority for such 'corrected' analysis to be considered in evidence. From these findings the conclusion follows that the seventy tons of guano, as shown by the official analysis, fell short more than three per cent. in phosphoric acid as guaranteed, and hence the value of such shortage must be deducted and the penalty must be applied. Accordingly I find and now render judgment for plaintiff against the defendant for the principal sum of seventeen hundred and sixty-two and 45/100 ($1762.45) dollars, together with interest on said principal sum at the rate of seven per cent. per annum from October 1st, 1917, to date of this judgment. Judgment signed this 9th day of May, 1919, the court having held the cause under advisement in the meanwhile. W. M. Harper, Judge, City Court of Americus.' To the first ruling as made by the trial judge the defendant excepts; and to the second ruling the plaintiff excepts by cross-bill.

"1. (*a*) Where a contract for the purchase of fertilizers specifically provides from what source the phosphoric acid, the nitrogen, or the potash is to be derived, and where the fertilizer is furnished in accordance with such special order, does the provision of law embodied in section 1771 of Park's Code have such application as would render the contract of sale void unless the fertilizers so furnished had been registered as provided by that statute?

" (*b*) If the answer to the above question be in the affirmative, would the fact that such fertilizers were furnished as ordered, under a name or brand properly registered with the Commissioner of Agriculture, but which registration gives a source other than the actual one from which the phosphoric acid, nitrogen, or potash is derived, operate to change the rule?

" (*c*) If the answer to the last foregoing question is in the negative, then where the brand as registered states that the nitrogen is derived from 'blood, tankage, cyanimid, and sulphate of ammonia,' and the proof shows that in accordance with the contract of purchase the nitrogen is derived from 'equal parts of fish-scrap, blood, and tankage,' is there such variance between the registered sources and the actual sources as would invalidate the contract of purchase,

under the provisions of section 1771 of Park's Code, governing registration of fertilizer brands?

" 2.    (a) After a sample of fertilizer drawn by the official inspector has been filed with the Commissioner of Agriculture, and has been analyzed by the State Chemist and certified by him to the Commissioner of Agriculture, and by him recorded and entered as official, has the Commissioner of Agriculture the right or power to make, through the State Chemist, another or corrected analysis from the same sample, which, upon proper certification, can be admissible as evidence in the courts of this State on the trial of any issue involving the merits of said fertilizer?

" (b) If the answer to the above and foregoing question be in the negative, would such corrected analysis be admissible when supported by the testimony of the State Chemist to the effect that the original analysis was incorrect, and that the second analysis was correct; or could the evidence of the State Chemist setting forth the incorrectness of the first analysis, and the correctness of the second analysis, be of itself sufficient to overcome the prima facie presumption in favor of the original analysis?"

*Hixon & Pace,* for plaintiff in error.    *John B. Guerry,* contra.

BECK, P. J., and GEORGE, J.    We concur in the answers (given in the headnotes) to the foregoing questions, considered alone, without reference to the statement of facts which precedes them, and which could not be properly certified to this court for its consideration.