308 Ga. 812
FINAL COPY

S20Q0374. SAN MIGUEL PRODUCE, INC. v. L. G. HERNDON
JR. FARMS, INC.

BOGGS, Justice.

The United States District Court for the Southern District of Georgia has certified three questions to this Court regarding the scope of the Georgia Dealers in Agricultural Products Act, Ga. L. 1956, p. 617 (codified as amended at OCGA §§ 2-9-1 to 2-9-16) ("the Act"). See *San Miguel Produce v. L. G. Herndon Jr. Farms,* Case No. 6:16-cv-35, 2019 U.S. Dist. LEXIS 154960, 2019 WL 4309021 (Sept. 11, 2019). At issue here is the effect of the Act's provisions upon contracts entered into by an agricultural products dealer that has failed to obtain a license from the Georgia Commissioner of Agriculture: in this case, a contract entered into between San Miguel Produce, Inc. ("San Miguel"), a California corporation, and L. G. Herndon Jr. Farms, Inc. ("Herndon Farms"), a Georgia corporation.

In its certification order, the district court noted that most of

the claims in the litigation depend upon interpretation of the Act, which the appellate courts of Georgia have never before construed. Reluctant to decide questions of Georgia "state public policy and legislative intent" in the first instance, *San Miguel Produce*, 2019 U.S. Dist. LEXIS 154960, at *14 (II), the district court certified the following three questions to this Court:

> (1) Does an entity that purchases produce from other growers, has it processed, and then markets, sells, and ships that produce qualify as a "[d]ealer in agricultural products" as defined in OCGA § 2-9-1 (2), or does that entity meet the "farmers in the sale of agricultural products grown by themselves" exemption in OCGA § 2-9-15 (a) (1) because at times it *also* processes, markets, sells, and ships produce that it grew itself as part of the same business operation?

> (2) Under the contract rule restated in *Paulsen St. Investors v. EBCO General Agencies*, [237 Ga. App. 116 (514 SE2d 904) (1999)], and quoted in this Order, are the licensing requirements set forth by the Dealers in Agricultural Products Act, OCGA § 2-9-1 *et seq.*, regulatory in the public interest or merely for revenue purposes?

> (3) If a "[d]ealer in agricultural products," as defined by OCGA § 2-9-1 (2), fails to obtain a license, as required by OCGA § 2-9-2, prior to engaging in a business that comes within the terms of the Act, is it precluded from recovering on a contract made to carry out that business?

(Emphasis in original.) *San Miguel Produce*, 2019 U.S. Dist. LEXIS 154960, at \*16-17 (II).

As explained below, we conclude, first, that an entity as described by the district court does qualify as a dealer in agricultural products under the Act and is not exempt under OCGA § 2-9-15 (a) (1), with the limited exception of specific transactions "in the sale of agricultural products grown by [itself]." Second, we conclude that the Act's licensing requirements are part of a comprehensive regulatory scheme in the public interest and not merely a revenue measure. Finally, we conclude that if a dealer has failed to obtain a license as required by OCGA § 2-9-2, it may not recover under a contract to the extent that the contract relates to business coming within the terms of the Act.[1]

1. In September 2014, San Miguel and Herndon Farms entered into several agreements, including one styled "Grower-Shipper Agreement" ("the GSA"). Under the GSA, Herndon Farms was

---

[1] The Court thanks the Georgia Department of Agriculture for its brief amicus curiae.

responsible for growing and delivering produce ordered by San Miguel to ROBO Produce, LLC ("ROBO"), a packing and processing facility in Toombs County jointly owned by San Miguel and Herndon Farms.[2] In the GSA, Herndon Farms agreed to source crops from other growers in the event that it could not meet San Miguel's anticipated volume of orders. San Miguel agreed to purchase the produce delivered by Herndon Farms, to sell and market all products to its regional and national accounts, and to provide sales and marketing opportunities for Herndon Farms' bulk products sales. The GSA provides that it "shall be construed pursuant to and in accordance with the laws of the State of Georgia." At no point during the making of the parties' agreements or during their short-lived business arrangements did San Miguel obtain a Georgia agricultural products dealer license.

Issues arose with Herndon Farms' ability to deliver or source sufficient produce from third-party growers to meet San Miguel's

---

[2] As the district court observed in its order, San Miguel, Herndon Farms, and ROBO entered into several other agreements regarding the ownership, operation, and property of ROBO.

requirements, and San Miguel began shipping its own produce from California to the ROBO facility. The business arrangement proved unsuccessful, and in February 2016, the parties terminated their relationship.

On March 25, 2016, San Miguel filed a complaint in the district court against Herndon Farms, and on April 5, 2016, Herndon Farms filed a separate action against San Miguel in the Superior Court of Toombs County, which was removed to federal court. The actions were consolidated, and the parties filed cross-motions for partial summary judgment.

According to the district court's order, many of the parties' claims have been abandoned, and the remaining claims asserted by Herndon Farms concern two alleged breaches of the GSA by San Miguel: failing to pay invoices on delivered produce and inducing Herndon Farms to grow produce before terminating the GSA. San Miguel's remaining claims, apart from a federal law claim and a claim for breach of the ROBO operating agreement, are based on the

GSA.[3] Therefore, as the district court noted, the application of the relevant Georgia law to the GSA is "the determinative question" upon which the case turns.

2. At the time San Miguel and Herndon Farms entered into the GSA, the Act had been in effect for more than half a century. See Ga. L. 1956, p. 617. The Act bears some similarities to an earlier federal law, the Perishable Agricultural Commodities Act, 1930, Pub. L. No. 71-325, 46 Stat. 531 (codified as amended at 7 USC §§ 499a to 499s) ("PACA").

> Congress enacted the PACA in 1930 to prevent unfair business practices and promote financial responsibility in the interstate commerce of shipping and handling of perishable agricultural commodities, like fresh fruits and vegetables. The statute requires that brokers and dealers be licensed by the Secretary, and that licensees refrain from unfair business conduct. The PACA also provides a system of penalties for these violations. The Secretary may revoke or suspend the license of a licensee who fails to make full payment promptly for perishable shipments.

(Citations and punctuation omitted.) *Bama Tomato Co. v. United*

---

[3] According to the district court's order, San Miguel's claims for negligent misrepresentation and unjust enrichment "are bound up in the GSA."

*States Dept. of Agriculture*, 112 F3d 1542, 1545 (II) (11th Cir. 1997). See also *George Steinberg & Son, Inc. v. Butz*, 491 F2d 988, 990 (2d Cir. 1974) ("Essentially [PACA] provides a system of licensing and penalties for violations.").

Georgia's Act imposes a similar, though not identical, licensing system upon dealers in agricultural products who engage in such business in Georgia.[4] Subject to the exemptions in OCGA § 2-9-15, a "dealer in agricultural products," as that term is defined in OCGA § 2-9-1 (2), is required to obtain a license from the Commissioner of Agriculture. See OCGA § 2-9-3. See also OCGA § 2-9-2 ("It shall be unlawful for any dealer in agricultural products who comes within the terms of this article to engage in such business in this state without a state license issued by the Commissioner."). The Commissioner may decline to grant a license, or suspend or revoke a license already granted, for certain enumerated instances of

---

[4] The Act has been called "Georgia's 'mini-PACA.'" D. Richard Jones III & Greg B. Walling, A Produce Debtor's Nightmare; A Produce Creditor's Dream: Perishable Agricultural Commodities Act, 4 Ga. Bar Journal 20 (Feb. 1999), available at
https://www.gabar.org/newsandpublications/georgiabarjournal/archive.cfm.

misconduct. See OCGA § 2-9-7 (1)-(7). Agricultural products dealers must post a surety bond in an amount to be determined by the Commissioner, not exceeding an amount equal to the maximum amount of products actually or estimated to be purchased from or sold on behalf of Georgia producers in any month, ranging from a minimum of $10,000 up to a maximum of $500,000 depending on the agricultural products involved. See OCGA § 2-9-5. The Act imposes record-keeping and prompt payment requirements, see OCGA § 2-9-9 to 2-9-9.1, and provides for the investigation of complaints, inspections, and quality assurance, see OCGA §§ 2-9-10 to 2-9-12. The Act also authorizes the Commissioner to promulgate and enforce rules and regulations and to seek injunctions and restraining orders. See OCGA §§ 2-9-13 and 2-9-14. Finally, the Act makes it a misdemeanor for any dealer in agricultural products to violate any provision of the Act or to interfere with an agent of the Commissioner in the enforcement of the Act. See OCGA § 2-9-16.

3. The first certified question involves two separate provisions of the Act, OCGA §§ 2-9-1 (2) and 2-9-15 (a) (1). OCGA § 2-9-1 (2)

states in relevant part:

> "Dealer in agricultural products" means any person, association, itinerant dealer, partnership, or corporation engaged in the business of buying, receiving, selling, exchanging, negotiating, or soliciting the sale, resale, exchange, or transfer of any agricultural products purchased from the producer or his or her agent or representative or received on consignment from the producer or his or her agent or representative or received to be handled on a net return basis from the producer. . . .

OCGA § 2-9-15 (a) (1) states: "This article shall not apply to . . . [f]armers or groups of farmers in the sale of agricultural products grown by themselves[.]"

San Miguel does not dispute that it meets the definition of a "dealer in agricultural products" in OCGA § 2-9-1 (2). Instead, San Miguel asserts that it is part of a "group of farmers" by reason of its "joint business relationship" or "farming venture" with Herndon Farms, and was engaged "in the sale of agricultural products grown by [itself]" because, at times, it filled orders with produce that it grew on its farms in California, and it therefore was exempt under

OCGA § 2-9-15 (a) (1).[5] But by the plain language of the Act, this exemption applies only "in the sale" of those specific products, while OCGA § 2-9-1 (2) defines a "'[d]ealer in agricultural products'" as one "*engaged in the business* of buying, receiving, selling, exchanging, negotiating, or soliciting the sale, resale, exchange, or transfer of any agricultural products[.]" (Emphasis supplied.) The General Assembly plainly distinguished between the general business of a dealer in agricultural products and specific instances of the sale of a dealer's own produce. See *Deal v. Coleman*, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013) ("When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read

---

[5] We need not reach the question of what constitutes a "group of farmers" within the meaning of OCGA § 2-9-15 (a) (1), because the GSA itself forecloses San Miguel's assertion of a "joint business relationship" or "farming venture" with Herndon Farms: it provides that the parties are "independent businesses" and that the GSA creates "a contractual growing arrangement. This is not a joint venture or a partnership."

the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." (citations and punctuation omitted)).

While San Miguel appears to have occasionally shipped its own produce to fill some orders, the exemption in OCGA § 2-9-15 (a) (1) does not exclude *all* of San Miguel's business from the definition in OCGA § 2-9-1 (2), only those particular transactions involving its own produce. As the Department of Agriculture points out in its amicus brief, this interpretation is consistent with federal law. PACA's analogous definitional section states that "no producer shall be considered as a 'dealer' in respect to sales of any such commodity of his own raising[.]" 7 USC § 499a (b) (6) (A). A related federal regulation states that "[g]rowers who market produce grown by others" are also dealers. 7 CFR § 46.2 (m) (3). Even though PACA and its accompanying regulations differ in some respects from the Georgia Act, for example in not containing any reference to "[f]armers or groups of farmers[,]" we find its provisions persuasive with respect to the distinction between the general business of

purchasing agricultural products grown by another, even if the dealer is also a grower, and the limiting of the exemption in OCGA § 2-9-15 (a) (1). Otherwise, any dealer could escape the licensing, bonding, and other requirements of the Act for its entire operation simply by growing and selling some small quantity of agricultural product.

With respect to transactions involving produce supplied by or through another, a dealer in agricultural products is not engaged "in the sale of agricultural products grown by [itself]." OCGA § 2-9-15 (a) (1). Accordingly, this provision does not exempt a dealer from complying with the Act in general, but only exempts the specific transactions in which the dealer supplies produce grown by itself.

4. The second certified question refers to the district court's quotation from a Court of Appeals decision, *Paulsen Street Investors*, 237 Ga. App. at 118 (1):

> [W]here a statute provides that persons proposing to engage in a certain business shall procure a license before being authorized to do so, and where it appears from the terms of the statute that it was enacted not merely as a revenue measure but was intended as a regulation of such

> business in the interest of the public, contracts made in violation of such statute are void and unenforceable. Accordingly, at whatever stage of the proceedings it appears that the plaintiff is seeking to recover upon a contract permitted to be entered into only by persons holding licenses issued as a regulatory measure, it becomes imperative for the plaintiff to prove that he holds such a license and held such license at the time the contract was entered into in order to authorize a recovery.

(Citation and punctuation omitted.) The district court asks whether, under the contract rule restated in *Paulsen Street Investors*, the Act is "regulatory in the public interest or merely for revenue purposes."

We conclude that the Act is intended as regulation in the public interest. It provides a comprehensive plan, administered by the Department of Agriculture, governing the licensing of dealers in agricultural products and their transactions with Georgia producers. In addition to criminal penalties, the Act provides for investigation of the fitness of a licensee, a payment bond requirement, inspections of products, and procedures and hearings for license revocation, dispute resolution, and claims on surety bonds, as well as injunctive relief. In contrast, the annual fee associated with this regulatory scheme, as provided by OCGA §

2-9-4, is capped at $400, and the regulations promulgated by the Department of Agriculture currently provide for a fee between $50 and $100, depending on the amount of a dealer's surety bond. See Ga. Comp. R. & Regs. r. 40-30-2-.03 (2).

The rule restated in *Paulsen Street Investors* originated in a long line of decisions from this Court, dating back to the nineteenth century, analyzing the investigation and enforcement provisions of licensing statutes to determine if they are regulatory or merely revenue-based. See, e.g., *Taliaferro v. Moffett*, 54 Ga. 150, 153 (2) (1875) (license for apothecaries required examination by medical board and record-keeping, and provided criminal penalties for failure to comply). In *Mgmt. Search v. Kinard*, 231 Ga. 26 (199 SE2d 899) (1973), this Court held that the since-repealed Private Employment Agencies Act, former Ga. Code Ann. § 84-4101 et seq., was

> a regulatory measure in the public interest and not a mere revenue measure. This Act requires more than the mere obtaining of a business license and a mere reading of the Act discloses without contradiction that it is an enactment for the protection of the public and a

recognition that unless such employment agencies are solvent and operated by persons of integrity, the public is not protected.

231 Ga. at 28 (1) (Act provided for application, investigation, a security bond, and the resolution of complaints, and made failure to obtain license a misdemeanor). See also *Planters Fertilizer Co. v. Wheeler*, 142 Ga. 153, 155 (82 SE 564) (1914) (contrasting statutes "for the registration of brands and the analysis of fertilizers in the office of the commissioner of agriculture . . . for the protection of users of commercial fertilizers," including a misdemeanor penalty for failure to comply, with statute providing for optional "tax tags" to be affixed to bags of fertilizer upon payment of an inspection fee); *Toole v. Wiregrass Dev. Co.*, 142 Ga. 57, 61 (82 SE 514) (1914) (contrasting real estate licensing statute in Revenue Code that was "adopted primarily for the purpose of raising revenue," with statute cited in *Murray v. Williams*, 121 Ga. 63, 64 (48 SE 686) (1904), "regulating the practice of medicine in this State . . . on grounds of public policy and for the protection of the citizens of the State," and requiring physicians to register their personal information with the

clerk of the superior court of their county of residence, together with an affidavit providing their professional qualifications). Similarly, in *Paulsen Street Investors*, the Court of Appeals found the licensing provision of the Insurance Premium Finance Company Act, OCGA § 33-22-3 (a), to be regulatory rather than revenue-based, noting that the statute also provides for such matters as investigation of the applicant by the relevant authority; capital requirements, deposit of securities, or a bond in order to ensure financial responsibility; record-keeping and the inspection of those records by the relevant authority; and the revocation of the license for good cause. 237 Ga. App. at 118-119 (1).[6] The rule restated in *Paulsen Street Investors* and cited by the district court is therefore consistent with this Court's previous decisions.

In its supplemental brief, San Miguel argues that farmers do not constitute "the public," but only a special-interest group, so that the Act is not a regulatory statute in the public interest. San Miguel

---

[6] *Paulsen Street Investors* relies upon *Bowers v. Howell*, 203 Ga. App. 636, 636-637 (1) (417 SE2d 392) (1992), which in turn relies upon this Court's decision in *Kinard*.

argues that the test should be not whether the legislation is revenue-based or regulatory, but only whether it is intended to affect the public at large. This argument is without merit.

From the inception of the revenue-versus-regulatory test, it has been applied to farmers. See, e.g., *Hodges v. Montezuma Fertilizer Co.*, 150 Ga. 248, 251 (103 SE 231) (1920) (70 tons of guano); *Conley v. Sims & Blalock*, 71 Ga. 161, 162 (1883) (fertilizer purchased on credit with option "to pay this note in cotton" and waiving liability for any "failure to benefit crops" (punctuation omitted)). Moreover, these decisions have considered the protection of Georgia farmers to be an important aspect of public policy. As this Court observed many years ago, in enacting the fertilizer inspection and licensing statutes to protect Georgia farmers,

> [t]he public policy of this state was to prevent the sale of fertilizers manufactured within or without its limits, unless they were first analyzed and inspected, so as to *give protection to one of her greatest interests*, and prevent the fraudulent imposition of spurious and worthless compounds upon *that portion of her people* who pay full 100 cents in the dollar for every one they realize from the soil.

(Emphasis supplied.) *Johnston Bros. & Co. v. McConnell*, 65 Ga. 129, 131 (2) (1880).

Moreover, given the significant and undisputed role that agriculture plays in the economy of Georgia, as well as the interest of all citizens of Georgia in a reliable and cost-effective food supply, legislation to ensure that Georgia farmers are protected in their transactions with dealers is regulation in the public interest. Like the similar federal PACA, the Act seeks to protect farmers from unfair trading practices by agricultural dealers. See OCGA §§ 2-9-5 (bond provision intended to "secure the faithful accounting for and payment to producers or their agents or representatives of the proceeds of all agricultural products handled or sold by such dealer"); 2-9-7 (license may be revoked for, e.g., dealer's failure to account or make settlements with producer, false charges, false statements, or selling producer's goods on dealer's own account); 2-9-10 (commissioner authorized to investigate allegations of such misconduct); 2-9-12 (unlawful for dealer to offer or sell substandard agricultural products). See also *In re Kornblum & Co.*, 81 F3d 280,

283 (2d Cir. 1996) (federal PACA "designed primarily for the protection of the producers of perishable agricultural products" in an industry that "presents many opportunities for sharp practice and irresponsible business conduct" (citations and punctuation omitted)). In accord with our long-standing precedent, therefore, we hold that the licensing requirement of the Act is not a mere revenue measure, but regulatory in the public interest.

5. The final certified question is whether a dealer's failure to obtain a license as required by the Act precludes its recovery under a contract made to carry out business covered by the Act. We conclude that, under the circumstances presented here, a dealer that fails to obtain a license is precluded from recovery under contract provisions related to dealing in agricultural products.

The district court correctly recognized that *Paulsen Street Investors* summarizes well-established Georgia law: when a statute requires a person to obtain a license before engaging in a certain business, and the terms of the statute show that it is intended not merely as a revenue measure but to regulate that business in the

public interest, a person seeking to recover under a contract to engage in such business must prove that he held the appropriate license in order to enforce his claims under the contract. See 237 Ga. App. at 118 (1). This longstanding rule has been applied to numerous statutes governing professions and trades. See, e.g., *Padgett v. Silver Lake Park Corp.*, 168 Ga. 759, 762-763 (149 SE 180) (1929) ("If a salesman has carried on his business as such without having paid the license fee and procured the license as required, his acts are unlawful under the act, and he can not recover compensation under a contract for services rendered."). See also *Kinard*, 231 Ga. at 28 (1) (private employment agency); *Murray*, 121 Ga. at 64 (physician). And

> [e]ven where there is no express provision that the contract . . . shall be void, still if the statute imposes a penalty for practicing without having obtained a license, or without having complied with other statutory provisions, the courts will apply the prohibition.

(Citation and punctuation omitted.) *Murray*, 121 Ga. at 64 (barring recovery for services by unlicensed physician). See also *Culverhouse v. Atlanta Assn. for Convalescent Aged Persons*, 127 Ga. App. 574,

577 (2) (194 SE2d 299) (1972) (collecting cases and stating that "[w]here a statute enacts, for the purpose of securing a more effectual compliance with its requirements in respect to the licensing of certain occupations, that no one shall engage in or carry on any such occupation until he shall have obtained the license as provided by law, it is an express prohibition without more particular words" (citations and punctuation omitted)).

San Miguel contends that the rule stated in *Paulsen Street Investors* and in the many prior decisions of this Court and the Court of Appeals reflects merely "an old common-law rule" and is irrelevant to the application of the Act, citing several more recent licensing statutes that expressly provide that contracts with unlicensed entities are void. But the provisions in the more recent statutory enactments are not inconsistent with the existing body of law, which, as noted above, consistently recognizes that failure to comply with a licensing statute that is regulatory in the public interest may prohibit recovery on a contract made in violation of the statute even in the absence of an express provision. See, e.g., *Toole*,

142 Ga. at 65 (noting that contract made in violation of statutory licensing requirement could be voided "expressly or by necessary implication"). Contrary to San Miguel's suggestion, the General Assembly is not required to revisit every licensing statute with a regulatory purpose and revise it to include an express voiding provision.

San Miguel further argues that contracts "contravening public policy" should be limited to the examples given in OCGA § 13-8-2 (a), which do not include regulatory violation of licensing requirements.[7] We are not persuaded. The language of OCGA § 13-8-2 (a) has remained essentially unaltered for at least 160 years, see Code of 1860, § 2714; Code of 1867, § 2708; Code of 1873, § 2750;

---

[7] OCGA § 13-8-2 (a) provides:
   A contract that is against the policy of the law cannot be enforced. Contracts deemed contrary to public policy include but are not limited to:
      (1) Contracts tending to corrupt legislation or the judiciary;
      (2) Contracts in general restraint of trade, as distinguished from contracts which restrict certain competitive activities, as provided in Article 4 of this chapter;
      (3) Contracts to evade or oppose the revenue laws of another country;
      (4) Wagering contracts; or
      (5) Contracts of maintenance or champerty.

Code of 1882 § 2750; Civil Code of 1895, § 3668; Civil Code of 1910, § 4253; Code of 1933, § 20-504, and has coexisted peacefully throughout that time with our longstanding precedent that we apply today. It therefore contains nothing that undermines that case law.

The terms of the Act make the licensing requirement regulatory in the public interest, and under longstanding precedent, a dealer in agricultural products that has failed to obtain the required license under the Act is precluded from recovering under a contract made to carry out business that falls within the terms of the Act.

*Certified questions answered. All the Justices concur, except Ellington, J., not participating.*

DECIDED MAY 18, 2020.
Certified questions from the United States District Court for the Southern District of Georgia.

*Alston & Bird, Nowell D. Berreth, Amanda M. Waide, Max P. Marks*, for appellant.

*Craig A. Stokes; Joseph M. Hall; Hull Barrett, William J. Keogh III, Neal W. Dickert*, for appellee.

*Christopher M. Carr, Attorney General, Isaac Byrd, Deputy Attorney General, Robin J. Leigh, Senior Assistant Attorney General, Margaret K. Eckrote, Assistant Attorney General, Andrew A. Pinson, Solicitor-General, Ross W. Bergethon, Deputy Solicitor-General,* amici curiae.